# UNITED STATES DISTRICT COURT FOR
# DISTRICT OF NEW JERSEY

| | |
|---|---|
| Avery Dennison Corporation,<br><br><br><br>Plaintiff,<br><br>v.<br><br>Marsh & McLennan Companies, Inc., Marsh Inc., Marsh USA Inc., d.b.a. Marsh Risk and Insurance Services, Hilb, Rogal & Hobbs Co., d.b.a. Insurance Services, Inc., ACE Limited, ACE INA Holdings, Inc., ACE USA, Inc., ACE American Insurance Co., American International Group, Inc., AIU Insurance Co., National Union Fire Ins. Co. of Pittsburgh, Pa., Liberty Mutual Holding Company, Inc., Liberty Mutual Insurance Co., Liberty Insurance Underwriters, Inc., Zurich Financial Services Group, Zurich American Insurance Co., American Guarantee & Liability Insurance Co., St. Paul Travelers Companies, Inc., and St. Paul Fire & Marine Insurance Co.,<br><br>Defendants. | No. |

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff Avery Dennison Corporation ("Avery") by its attorneys, brings this antitrust action for injunctive relief and damages against defendants Marsh & McLennan Companies, Inc., Marsh Inc. ("Marsh Inc."), and Marsh USA

Inc.("Marsh USA"), d.b.a. Marsh Risk and Insurance Services (collectively "Marsh" and/or the "Marsh Defendants"), and Hilb, Rogal & Hobbs Company ("HRH") (the Marsh Defendants and HRH are referred to collectively as the "Broker Defendants"), and ACE Limited ("ACE Ltd."), ACE INA Holdings, Inc. ("ACE INA"), ACE USA, Inc. ("ACE USA"), ACE American Insurance Co. ("ACE American"), American International Group, Inc. ("AIG, Inc."), AIU Insurance Co. ("AIU"), National Union Fire Ins. Co. of Pittsburgh, Pa. ("National Union"), Liberty Mutual Holding Company, Inc. ("Liberty Mutual Holding"), Liberty Mutual Insurance Co. ("Liberty Mutual Ins."), Liberty Insurance Underwriters, Inc. ("LUI"), Zurich Financial Services Group ("Zurich Financial"), Zurich American Insurance Co. ("Zurich American"), American Guarantee & Liability Insurance Co. ("American Guarantee"), St. Paul Travelers Companies, Inc. ("St. Paul Travelers"), and St. Paul Fire & Marine Insurance Co. ("St. Paul Fire") (collectively the "Insurer Defendants") for a trial by jury and states as follows:

## PARTIES

1.      Plaintiff Avery Dennison Corporation ("Avery") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in California.  In 2001, Avery acquired Dunsirn Industries, Inc. ("Dunsirn") (Avery and Avery as successor-in-interest to Dunsirn are referred to collectively as "Avery.")

### Broker Defendants

2.      Defendant Marsh & McLennan Companies, Inc. ("Marsh & McLennan"), is a corporation organized and existing under the laws of the State of Delaware with its principal place of business at 1166 Avenue of the Americas, New York, NY 10036.  Marsh & McLennan is the parent of various subsidiaries

that provide clients with analysis, advice and transactional services in connection with the procurement and servicing of insurance, as well as investment management and consulting.

3.      Defendant Marsh Inc. ("Marsh Inc.") is a corporation organized and existing under the laws of the State of Delaware with its principal place of business at 1166 Avenue of the Americas, New York, NY 10036.  Marsh Inc. is a Marsh & McLennan operating unit and provides insurance brokerage services through various subsidiaries of its own.

4.      Defendant Marsh USA Inc. ("Marsh USA"), d.b.a. Marsh Risk and Insurance Services, is a corporation organized and existing under the laws of the State of Delaware with its principal place of business at 1166 Avenue of the Americas, New York, NY 10036.  Marsh USA is a subsidiary of Marsh Inc. and provides insurance brokerage services.  Marsh USA entered into agreements with Avery to provide insurance brokerage services.  Defendants Marsh & McLennan, Marsh Inc. and Marsh USA are referred to collectively as "Marsh" and/or the "Marsh Defendants."

5.      Defendant Hills, Rogal & Hobbs Company, d.b.a. Insurance Services, Inc. ("HRH") is a corporation organized and existing under the laws of the Commonwealth of Virginia with its principal place of business at 4951 Lake Brook Drive, Suite 500, Glen Allen, VA 23060-9273.  HRH provided insurance brokerage services to Dunsirn Industries, Inc. ("Dunsirn") which was acquired by Avery in 2001.  The Marsh Defendants and HRH are referred to collectively as the "Broker Defendants."

### Insurer Defendants

6.      Defendant ACE Limited ("ACE Ltd.") is a corporation organized and existing under the laws of the Cayman Islands with its principal place of business

at 17 Woodbourne Avenue, P.O. Box HM 1015, Hamilton, HMDX Hamilton HM08 Bermuda. ACE Ltd. owns ACE INA Holdings, Inc.

7.     Defendant ACE INA Holdings, Inc. ("ACE INA") is a corporation organized and existing under the laws of the State of Delaware with its principal place of business at 436 Walnut Street, Philadelphia, PA 19106-3703. ACE INA oversees global insurance operations and, through its operating companies, including ACE USA, Inc., is a leading provider of insurance and reinsurance.

8.     Defendant ACE USA, Inc. ("ACE USA") is an operating company of ACE INA and is a corporation organized and existing under the laws of the State of Delaware with its principal place of business at 436 Walnut Street, Philadelphia, PA 19106-3703. ACE USA operates through several insurance companies using a network of offices throughout the United States.

9.     Defendant ACE American Insurance Co. ("ACE American") is a subsidiary of ACE Ltd. and is organized and existing under the laws of the Commonwealth of Pennsylvania with its principal place of business at 436 Walnut Street, Philadelphia, PA 19106-3703. Defendant ACE American issued excess liability insurance policies to Avery. Defendants ACE Ltd., ACE INA, ACE USA, and ACE American are referred to collectively as the "ACE Defendants."

10.     Defendant American International Group, Inc. ("AIG Inc.") is a corporation organized and existing under the laws of the State of Delaware with its principal place of business at 70 Pine Street, New York, NY 10028. AIG Inc. and its related companies are the largest underwriters of commercial and industrial insurance in the United States.

11.     Defendant AIU Insurance Co. ("AIU") is a subsidiary of AIG Inc. and is organized and existing under the laws of the State of New York with its principal place of business at 70 Pine Street, New York, NY 10270. AIU is also partly

DM_US:20211921_1

owned by Defendant National Union Fire Ins. Co. of Pittsburgh, Pa. Defendant AIU issued excess liability insurance policies to Avery.

12. Defendant National Union Fire Ins. Co. of Pittsburgh, Pa. ("National Union") is a subsidiary of AIG Inc. and is organized and existing under the laws of the Commonwealth of Pennsylvania with its principal place of business at 70 Pine Street, New York, NY 10270. Defendant National Union issued excess liability insurance policies to Avery. Defendants AIG Inc., AIU and National Union are referred to collectively as the "AIG Defendants."

13. Defendant Liberty Mutual Holding Company, Inc. ("Liberty Mutual Holding") is a corporation organized and existing under the laws of the Commonwealth of Massachusetts with its principal place of business at 175 Berkeley Street, Boston, MA 02117.

14. Defendant Liberty Mutual Insurance Co. ("Liberty Mutual Ins.") is a subsidiary of Liberty Mutual Holding and is organized and existing under the laws of the Commonwealth of Massachusetts with its principal place of business at 175 Berkeley Street, Boston, MA 02117. Defendant Liberty Mutual Ins. issued excess liability insurance policies to Avery.

15. Defendant Liberty Insurance Underwriters, Inc. ("LIU") is a subsidiary of Liberty Mutual Holding and is organized and existing under the laws of the Commonwealth of Massachusetts with its principal place of business at 175 Berkeley Street, Boston, MA 02117. Defendant LIU issued excess liability insurance policies to Avery. Defendants Liberty Mutual Holding, Liberty Mutual Ins. and LIU are referred to collectively as the "Liberty Mutual Defendants."

16. Defendant Zurich Financial Services Group ("Zurich Financial") is a corporation organized and existing under the laws of Switzerland with its principal place of business Mythenquai 2, 8022 Zurich, Switzerland and describes itself as

an insurance-based financial services provider with an international network with key markets in North America and Europe.

17.     Defendant Zurich American Insurance Co. ("Zurich American") is a corporation organized and existing under the laws of the State of New York with its principal place of business at 1400 American Lane, Schaumburg, IL 60196. Zurich American is an indirect wholly owned subsidiary of Zurich Financial. Zurich American issued workers compensation insurance policies to Dunsirn to which Avery is the successor-in-interest.

18.     Defendant American Guarantee & Liability Insurance Co. ("American Guarantee") is a subsidiary of Zurich American and is organized and existing under the laws of the State of New York with its principal place of business at 1400 American Lane, Schaumburg, IL 60196.  Defendant American Guarantee issued excess liability insurance policies to Avery.  Defendants Zurich Financial, Zurich American and American Guarantee are referred to collectively as the "Zurich Defendants."

19.     Defendant St. Paul Travelers Companies, Inc. ("St. Paul Travelers") is a corporation organized and existing under the laws of the State of Minnesota with its principal place of business at 385 Washington St, St Paul, MN, 55102.  St. Paul Travelers was formed from a 2004 merger between Travelers Property Casualty Corp. and the St. Paul Companies, Inc.  The merger created the second largest commercial  insurance company in the United States

20.     Defendant St. Paul Fire & Marine Insurance Co. ("St. Paul Fire") is a subsidiary of St. Paul Travelers and is organized and existing under the laws of the State of Minnesota with its principal place of business at 385 Washington St, St Paul, MN, 55102.  Defendant St. Paul Fire issued excess liability insurance policies to Avery.  Defendant St. Paul Travelers also issued commercial general

liability policies to Dunsirn to which Avery is the successor-in-interest. Defendants St. Paul Travelers and St. Paul Fire are referred to collectively as the "St. Paul Defendants."

21.     The ACE Defendants, the AIG Defendants, the Liberty Mutual Defendants, the Zurich Defendants and the St. Paul Defendants are collectively referred to as the "Insurer Defendants."

22.     The Insurer Defendants and the Broker Defendants are collectively referred to as the "Defendants."

### JURISDICTION AND VENUE

23.     Because this civil action arises under the Sherman Act, 15 U.S.C. § 1, this Court has subject matter jurisdiction pursuant to section 4 of the Clayton Act, 15 U.S.C. § 15, section 16 of the Clayton Act, 15 U.S.C. § 26 and 28 U.S.C. §§ 1331 and 1337.  This Court has subject matter jurisdiction over claims arising under state law pursuant to 28 U.S.C. § 1367.

24.     Defendants Marsh & McLennan, Marsh Inc., Marsh USA, HRH, ACE Ltd., ACE INA, ACE USA, ACE American, AIG, AIU, National Union, Liberty Mutual Holding, Liberty Mutual Ins., LIU, Zurich Financial, Zurich American, American Guarantee, St. Paul Travelers and St. Paul Fire are subject to personal jurisdiction in this district because they engage in systematic and regular business in this district and because a substantial part of the events or omissions giving rise to the claims occurred in this district.

25.     Venue is proper in this district pursuant to 28 U.S.C. § 1391 and 15 U.S.C. §§ 15 and 22 because Defendants Marsh & McLennan, Marsh Inc., Marsh USA, HRH, ACE Ltd., ACE INA, ACE USA, ACE American, AIG, AIU, National Union, Liberty Mutual Holding, Liberty Mutual Ins., LIU, Zurich Financial, Zurich American, American Guarantee, St. Paul Travelers and St. Paul

Fire are subject to personal jurisdiction in this district and because a substantial part of the events giving rise to the claims occurred in this district.

## SUMMARY OF CLAIMS

26.　　This is an action for treble damages and attorneys' fees under the Sherman Act and for forfeiture of compensation, restitution, damages, punitive damages, prejudgment interest, injunctive relief and attorneys' fees under state law.  During the period from 1998 to 2005, Marsh received substantial compensation for serving as Avery's insurance broker.  From 1998 to 2005 Avery paid in excess of $4 million in insurance premiums for excess liability insurance policies to the ACE Defendants, the AIG Defendants, the Liberty Mutual Defendants, the Zurich Defendants and the St. Paul Defendants.  Marsh promised Avery during this period that it would act in the best interests of Avery to obtain cost-effective insurance but failed to do so.

27.　　During the period from, at least, 1998 to 2001, HRH received substantial compensation for serving as Dunsirn's insurance broker.  From 1998 to 2001, Dunsirn paid substantial premiums to the Zurich Defendants and the St. Paul Defendants for workers compensation and/or commercial general liability insurance policies.  HRH promised Dunsirn during this period that it would act in the best interests of Dunsirn to obtain cost-effective insurance but failed to do so.

28.　　Avery's claims arise out of the Defendants' massive scheme to manipulate the market for commercial insurance.  The Defendants participated in a combination and conspiracy to suppress and eliminate competition in the sale of insurance by coordinating and rigging bids for insurance policies, allocating insurance markets and customers, including Avery, and raising, or maintaining or stabilizing premium prices above competitive levels.

29.     Avery is informed and believes, and on that basis alleges, that Marsh, through the actions of its Global Broking department in New York, and HRH engaged in bid-rigging through the solicitation and manipulation of bids, including the submission of false bids from excess casualty insurers, including the ACE Defendants, the AIG Defendants, the Liberty Mutual Defendants, the Zurich Defendants and the St. Paul Defendants, in order to obtain a preordained outcome of Avery's selection of an insurer.  Avery is further informed and believes, and on that basis alleges, that the Broker Defendants misrepresented the amount and nature of the compensation they received as Avery's insurance brokers by not disclosing or failing to adequately disclose their receipt of secret contingent commissions (a.k.a. "overrides") which are based on such factors as the volume of insurance that the Broker Defendants place with a particular insurer ("volume contingency"), the renewal of that business ("persistency contingency"), and its profitability ("claims loss ratios contingency"), all of which the Insurer Defendants, in concert with the Broker Defendants, control, at least in part, by manipulating the market for insurance placed for their client.  Avery is further informed and believes, and on that basis alleges, that Broker Defendants "steered" it to "preferred" Insurer Defendants who participate in and further the scheme by paying exorbitant contingent commissions and other undisclosed kickbacks to the Broker Defendants.

30.     As a direct and proximate result of the Defendants' illegal conspiracy described herein, Avery has been injured and financially damaged in its business or property.

# FACTS

## Avery's Relation with the Broker Defendants

31.     The Broker Defendants served as Avery's insurance brokers for many years.  The Broker Defendants represented to their clients, including Avery, that they would provide unbiased advice and assistance in the selection of insurance products and services relating thereto, including claims administration.  The Broker Defendants purport to offer independent expert brokering advice on such factors as coverage types and amounts, financial stability of carriers and overall cost of the insurance products, and thus act as fiduciaries as the agents of the client (Avery) in this relationship.  Indeed, the Broker Defendants represent themselves to their clients, including Avery, as fiduciaries and, in fact, have created fiduciary relationships with their clients, including Avery, based on the trust imparted to the Broker Defendants by their clients, including Avery, and the Broker Defendants' perceived ability to provide unbiased, independent and expert insurance brokerage advice.  Such representations are made through advertisement, brochures, internet websites and other promotional materials disseminated in interstate commerce, including through the United States mails and interstate wires.

32.     For example, Marsh's website has stated: "Our mission is 'To create and deliver risk services that make our clients more successful'" and that "[o]ur clients benefit from the total capabilities of Marsh, Inc. and Marsh & McLennan Companies, Inc. . . .  This systematic structure provides a breadth of depth of risk solutions unavailable from any other single source."

33.     HRJ has represented on its website that "An insurance relationship, more than any other business relationship, is built on trust.  You either have it or you don't."  It was further stated, "Specialist Knowledge:  We use our knowledge to solve problems for the benefit of our clients.  From Fortune 500 companies to

trade associations, individuals and small businesses, at HRH we provide tailor-made risk management solutions based on expert advice and customized risk assessment."

34.    Avery relied upon the sophistication and expertise of the Broker Defendants – derived from the Broker Defendants' familiarity with the Insurer Defendants, the overall marketplace, as well as customs and practices of the insurance industry – to make decisions when formulating strategies concerning Avery's insurance needs.  As Avery's insurance brokers, the Broker Defendants claimed to act in Avery's best interest for the express purpose of purchasing cost-effective insurance.

35.    As Avery's insurance brokers, the Broker Defendants had a responsibility to provide services and advice for the benefit of Avery including finding the most favorable insurance coverage available.

36.    As Avery's insurance brokers, the Broker Defendants agreed to represent Avery and not the insurance companies.  The Broker Defendants further agreed that they would negotiate on Avery's behalf with the insurance companies and keep Avery informed of any significant developments.

37.    Avery is informed and believes, and on that basis alleges, that instead of acting on Avery's behalf, as described above, the Broker Defendants colluded with the Insurer Defendants to improperly steer business and unlawfully rig bids and fix prices in order to maximize the amount of the commissions that the Broker Defendants would receive as Avery's insurance brokers.  The Broker Defendants did not represent Avery's best interest or act as fiduciaries in connection with the selection and placement of Avery's insurance.  Further, Avery is informed and believes and based thereon alleges that the Insurer Defendants have improperly increased their profits and revenues by raising or maintaining premiums charged to

(or by reducing the benefits or coverage received by) Avery. Together, the Broker Defendants and the Insurer Defendants have acted in concert, conspired to reduce or eliminate competition for insurance and otherwise harmed competition.

### The Defendants' Bid-Rigging Scheme

38. Avery is informed and believes, and on that basis alleges, that the Broker Defendants and the Insurer Defendants have conspired to raise, maintain or stabilize the price of insurance paid by Avery and other consumers at an artificially high level by allocating the placement of insurance customers' business through a pervasive bid-rigging scheme. Avery is further informed and believes, and on that basis alleges, that since 1998 or earlier and continuing to the present, the Broker Defendants and certain carriers, including the Insurer Defendants, agreed to rig the bids that the carriers made for casualty insurance coverage in the United States. Specifically, the Insurer Defendants agreed with the Broker Defendants that the Insurance Defendants would each submit fake bids (sometimes referred to as "A Quotes," "B Quotes" or "C Quotes") to guarantee that the incumbent insurance carrier would retain the business of a particular customer seeking to purchase casualty insurance. The Broker Defendants implemented this bid-rigging agreement among the carriers because it resulted in the payment of substantial commissions to the Broker Defendants.

39. Avery is informed and believes, and on that basis alleges, that instead of acting on Avery's behalf to obtain competitive bids for casualty insurance, the Broker Defendants orchestrated and implemented the issuance of fictitious and artificially inflated quotes and ("A Quotes," "B Quotes" or "C Quotes") from the Insurer Defendants in order to steer Avery's business to preselected insurers while providing the illusion of competitive bidding.

40.     Avery is informed and believes, and on that basis alleges, that in order
to rig the bids, the Broker Defendants directed carriers to prepare and submit false
records consisting of inflated and fictitious bids so that the Broker Defendants
could then pass these fictitious bids along to Avery in order to create the illusion of
competition.  For example, in one internal communication, Marsh informed its
brokers it "will need formal indications from carriers too regarding any pricing
indications for B quotes."  In another internal communication, Marsh managers
directed brokers to document the false and inflated quotes, stating that the insured
"will be looking to receive copies of the carriers emails or faxes that you receive
directly from the carrier that either state the carrier declining to quote or what the
high pricing indication is that is provided and unacceptable to Marsh."

41.     In plea agreements with the State of New York, current or former
employees of Marsh admitted that they agreed to rig bids in a scheme Marsh
coordinated.  Those making such admissions in plea agreements included Joshua
Bewley, former Managing Director of Marsh's Global Broking department, and
Robert Stearns, former Marsh Senior Vice President, both of whom were involved
in offering brokerage services to Avery.  Former Managing Director of Marsh's
Global Broking department, Kathryn Winter, also entered to a plea agreement.

42.     Avery is informed and believes, and on that basis alleges, that when
HRH solicited bids it would steer business to companies paying HRH the greatest
financial incentive by giving those companies a "last look" opportunity to match
the low bid.

43.     The bid-rigging coordinated by the Broker Defendants enabled
Defendants to maximize their profits and raise, maintain or stabilize the price of
insurance and deceived Avery into believing that the Broker Defendants were

obtaining competitive insurance bids from the Insurer Defendants on Avery's behalf.

44.     The Defendants affirmatively concealed from Avery the unlawful combination, conspiracy and agreements and falsely represented to Avery that the bids provided were fair and competitive.

45.     Avery relied upon the Broker Defendant's representations concerning the bids in accepting the bids it used to place its insurance coverage with the Insurer Defendants.

### Misrepresenting the Amount of Compensation

46.     Avery is informed and believes, and on that basis alleges, that, although Marsh receives a flat fee for providing brokerage services to Avery, Marsh knowingly and willfully conspired to enter into undisclosed fee agreements with the Insurer Defendants for other types of compensation and remuneration. Avery is also informed and believes, and on that basis alleges, that although HRH received a flat fee and/or standard commission for providing brokerage services to Avery's predecessor-in-interest, Dunsirn, HRH knowingly and willfully conspired to enter into undisclosed fee agreements with the Insurer Defendants for other types of compensation and remuneration. Pursuant to the Defendants' scheme and common course of conduct, the Broker Defendants steer their clients to purchase insurance from the Insurer Defendants, with whom the Broker Defendants have entered into such agreements, so that the Broker Defendants can receive undisclosed compensations. All Defendants ratified and adopted this scheme through the payment of and/or receipt of undisclosed compensations and the imposition of the undisclosed fees and costs resulting in injury to Avery.

47.     Avery is informed and believes, and on that basis alleges that, pursuant to various contingent commission agreements described below, certain

insurance companies, including the Insurer Defendants, pay fees to the Broker Defendants based on (i) the volume of premiums generated by the Broker Defendants' sales of the Insurer Defendant's products; (ii) the growth of business and renewal of existing business; and (iii) the profitability of business purchased by the Broker Defendants' clients, *i.e.,* agreed upon favorable total claims/loss ratios with a particular insurer ("Contingent Commissions").

48.     Avery is informed and believes, and on that basis alleges, that Contingent Commissions were often memorialized by the Broker Defendants in, among other things, "placement service agreements ("PSAs"), "override agreements," "millennium agreements," "extra compensation agreements," "producer compensation agreements," "market service agreements" ("MSAs") or "Compensation for Services to Underwriters" ("CSUs").   These Contingent Commission agreements are collectively referred to as "Contingent Commission Agreements" or "Agreements."

49.     Avery is informed and believes, and on that basis alleges, that, pursuant to the Defendants' conspiracy and common scheme, the Broker Defendants solicit business from individuals and entities interested in purchasing insurance and steer them to purchase insurance from the Insurer Defendants and other carriers, with whom the Broker Defendants have entered into PSAs or other profit sharing agreements so that the Broker Defendants can receive undisclosed compensations, including Contingent Commissions and other kickbacks.  The PSAs are a means of implementing or effectuating the conspiratorial agreement of the Defendants as all Defendants ratified, adopted and knowingly participated in the scheme through the payment and/or receipt of undisclosed compensation and the imposition of the undisclosed fees and costs, resulting in injury to Avery.

50.     Avery is informed and believes, and on that basis alleges, that the Defendants failed entirely to disclose the Contingent Commission Agreements or failed to adequately disclose them.  Avery was thus not aware of the existence, operation or effect of these undisclosed fees, and the Defendants' anti-competitive steering, bid-rigging and buying arrangements.  Taken together, the Defendants breached the duties owed to Avery by failing to fully and accurately disclose, among other things, the following:

(a)     the existence, source and amount of their Contingent Commissions;

(b)     the material impact of the Contingent Commissions on their overall profitability;

(c)     that the Contingent Commissions have created economic incentives for the Defendants to act contrary to their fiduciary duties to Avery;

(d)     that the Contingent Commissions have created economic incentives for the Defendants to act contrary to their duty of care to Avery;

(e)     that the Contingent Commissions have created economic incentives for the Defendants to act contrary to their duty of loyalty to Avery;

(f)     that the Contingent Commissions have created economic incentives for the Defendants to act contrary to their duty to provide impartial advice to Avery;

(g)     that  the Contingent Commissions have created economic incentives for the Defendants to act contrary to their duty to exercise their best judgment on behalf of Avery;

    (h)    that the Contingent Commissions have created economic incentives for the Defendants to act contrary to their duty of candor and full disclosure to Avery; and

    (i)    that the Contingent Commissions have created economic disincentives for the Defendants to carry out their contractual obligations to Avery.

51.    In the absence of proper disclosure of the Contingent Commissions, Avery justifiably relied, to its detriment, on the Broker Defendants' representations that they were providing independent expertise and representing Avery's interests in accordance with the Broker Defendants' contractual, fiduciary and other duties as alleged above. Avery also justifiably relied upon the Defendants' representations in connection with the insurance policies it purchased.

52.    Marsh continued to fail to adequately disclose Contingent Commission Agreements following the investigations of various state attorneys generals of the insurance industry in 2004. For example, Marsh posted a Frequently Asked Questions page on MSAs on its website in 2004 (which Marsh has subsequently removed), saying that Marsh had no conflicts with clients due to MSAs:

> Our guiding principle is to consider our client's best interests in all placements. We are our clients' advocate and represent clients in our negotiations. We don't represent the markets. We work closely with clients on the design of their risk transfer program to address the complexity of decisions that have to be taken into account, such as market financial strength, a market's expertise in the line of coverage needed, its claims-paying history, client's service requirements, breadth of coverage, pricing, and other terms and conditions. We also work with insurers, and part of what an insurer pays us for is an iterative planning and communications

> process that allows the insurer to create more competitive
> proposals for our clients, which of course benefits those
> clients.  In all cases, clients retain the final decision on
> the market chosen to handle its business.

As Marsh's subsequent settlement conceded, however, among other things, Marsh did not act in its client's best interests, did not advocate fairly on their behalf, and failed to provide clients with the information needed to make informed placement decisions.  Moreover, as J.P. Morgan noted in a 2004 report on the use by brokers of Contingent Commissions, "when we have pushed back in an attempt to determine the size and source of offsetting expenses [for such commissions], no significant, valid offsets were presented . . . .  We are hard-pressed to describe any material cost associated with these revenues."  Hugh Warns et al., Insurance-Non-Life:  Contingents May Be Smaller, But More Prominent in 2004, US Equity Research J.P. Morgan Sec., Inc. (Jan. 13, 2004).

53.    Additionally, in the fall of 2004, for property and casualty lines, Marsh briefly posted on its website a list of Insurer Defendants with which it had Contingent Commission Agreements including the ACE Defendants, the AIG Defendants, the Liberty Mutual Defendants, the St. Paul Defendants and the Zurich Defendants.

54.    Avery is informed and believes, and on that basis alleges, that, in order to hide the amount of compensation it receives, Marsh has directed employees to redact and "white-out" the commission income identified in the insurance "binders," *i.e.*, the temporary insurance contracts, prepared by the insurance carrier and sent to Marsh for transmittal to the client/insured.

55.    In one instance, a senior vice president at an insurer was reprimanded by Marsh for referring to the Placement Service Agreement between that insurer and Marsh in certain correspondence.  The insurer responded and assured Marsh: "We acknowledge that this was inappropriate behavior and will do the necessary to

eliminate all documentation, electronic or otherwise, that references or otherwise alludes to the PSA.  I apologize for the consternation that this has caused within the Marsh organization."

56.    Marsh's policy of misleading clients about the payment and receipt of Contingent Commissions recently came to light in the guilty plea of a former Marsh managing director, Joshua M. Bewlay, who pled guilty to a felony charge of scheming to defraud on February 14, 2005.  Mr. Bewlay's testimony revealed that Marsh established a procedure or a "protocol" intended to discourage the client from obtaining an answer on how Marsh received compensation from insurance companies.   Mr. Bewlay's testimony states, in relevant part:

> Finally, during my employment, I was made aware of a Marsh protocol designed to prevent Marsh's clients from obtaining accurate information concerning the amount of placement service or PSA or MSA revenue Marsh earned from carriers with respect to a particular client in addition to any fee or commission paid.  **The protocol required multiple layers of inquiry to discourage the client from obtaining an answer.**  Also that all inquiries be channeled through a single Marsh employee who directed the answer to the inquiry.  [Emphasis added.]

> Finally, the percentage or ration that Marsh used when it responded to a clients' inquiry concerning placement service or PSA or MSA revenue significantly understated the amount of PSA or MSA revenue earned with respect to a particular client.[1]  In my department, Global Brokerage and Excess Casualty significantly understated

---

[1] According to the criminal complaint against Mr. Bewlay, "the protocol" directed Marsh employees to tell inquiring clients that Marsh received up to 1% to 2% in PSAs/MSA as a bonus from insurers, when, in fact, Marsh sometimes earned as much as 10% to 15%.  *People of the State of New York v. Joshua Bewlay* (filed Feb. 22, 2005).

the amount of PSA or MSA revenue earned by Marsh
with respect to a particular client.

When I was told that a client inquired as to the amount of
PSA revenue Marsh earned from an insurance carrier, I
responded that the Marsh employee follow Marsh's
protocol, including that the client only speak to the
Marsh employee designated to respond to such inquiries.
[*People of the State of New York v. Joshua Bewlay*, Plea
Testimony (Fed. 15, 2005) at p. 11-12.]

57.     Mr. Bewlay similarly admitted in his plea agreement that he made

misleading statements about the amount of compensation Marsh received from

insurers.  Mr. Bewlay's plea agreement states, in relevant part:

From in and before 1999 through 2004, Mr. Bewlay
engaged in a scheme constituting a systematic ongoing
course of conduct with intent to defraud ten or more
persons and to obtain property, namely insurance
premiums, commissions and fees, from ten or more
persons, to wit, clients of Marsh, by false and fraudulent
pretenses, representations and promises, to wit,
misleading statements about the amount of
compensation Marsh derived from insurance carriers,
and so obtained property from one or more such person,
in that **Mr. Bewlay referred client inquiries for
disclosure of such compensation to a designated
Marsh employee, knowing that said employee would
provide misleading information concerning Marsh's
compensation to the clients.**  [Emphasis added.]
[Joshua Bewlay Plea Agreement (filed Feb. 14, 2005) at
¶5.]

58.     Avery is informed and believes, and on that basis alleges, that to

maximize the undisclosed revenue the Broker Defendants received from the

Agreements and in furtherance the Defendants' unlawful conspiracy, the Broker

Defendants steer their clients, including Avery, to Insurer Defendants in return for Contingent Commissions.

59.     For example, Marsh dictated to its brokers which insurance companies' policies they were to sell.  A managing director within Marsh advised colleagues that "Some [Contingent Commission Agreements] are better than others . . . . I will give you clear direction on who [we] are steering business to and who we are steering business from."

60.     Marsh's Global Broking executives also used a "tiering report" that segregated insurance companies by how favorable their Agreements were to Marsh.  The tiering report instructed recipients to "monitor premium placements" so that Marsh obtained "maximum concentration with Tier A and B" – the insurance companies with whom Marsh had the most favorable Agreements.  One Global Broking executive stated in a September 2003 email:  "We need to place our business in 2004 with those that have superior financials, broad coverage and pay us the most."

61.     The increased revenues Marsh gained from its relationship with its stable of preferred insurance companies, including the Insurer Defendants, was explained in a July 2000 Marsh memorandum entitled, "BUSINESS DEVELOPMENT STRATEGIES," describing one of the insurance companies with which Marsh had an Agreement:  "They have gotten the 'lions [sic] share' of our Environmental business PLUS they get an unfair 'competitive advantage['] as our preferred [sic] [insurance company]."

62.     Further evidence of the conspiratorial conduct between the Insurer Defendants and Marsh is an email dated November 7, 2003, from a Marsh Global Broking executive which states, "I made it clear that if ACE wants us to meet

significant premium growth targets then ACE will have to pay 'above market' for such [a] stretch . . . ."

63.    Another example of Marsh's influence on the Insurer Defendants was further revealed in the Connecticut AG Complaint against ACE which further illustrated how one insurance company found itself shut out by Marsh and found it necessary to enter into Contingent Commission Agreements simply to get business, stating:  "We are now being heavily penalized by Marsh for not having the [PSA] agreement signed.  We are being systematically excluded from . . . placements that we would otherwise like the chance to write."  Another insurance executive noted: "With Marsh if we don't have an override we should not call on them . . . they flat out told us if we want to write business we need to have an override, end of story . . . without them we are letting business walk away."

64.    As further demonstration of the illegal combination, conspiracy and agreements and in total disregard of its clients' interests, Marsh would avoid placing insurance with an insurer if doing so would put Marsh's receipt of Contingent Commissions at risk.  For example, a report from Marsh's Los Angeles office describes that, in late 2003, brokers in Marsh's Los Angeles office were ordered to temporarily stop selling personal coverage lines from AIG in order to avoid reducing commission payments to Marsh.  Marsh did not want to exceed an annual cap on policies with AIG in states with a high risk of earthquakes, hurricanes or other costly disasters, since exceeding the limit could reduce Contingency Commissions that Marsh expected to receive from AIG.  As reported in the Los Angeles Times, one broker stated "[t]he whole department couldn't believe it.  We kept saying, 'If this ever gets out, [the company would] be in so much trouble.'"

- 23 -

65.    Internally, Marsh rewards employees who maximize their contingent commission revenue by steering clients to only insurance companies with which it has Contingent Commission Agreements.  One Marsh employee was elevated to vice president, in part because he had been able to renew a client's business "by moving" that client to an insurance company with which Marsh had a PSA. Among his "[f]inancial success[es]" the soon-to-be vice president "was responsible for the renewal of a large HMO in Miami and was successful with placing of this account with a [contingent commission insurance company] – increased revenue from $120,000 to $360,000 (estimated)."  In critiquing himself on a 2003 self appraisal form, the now vice president stated:

> Renewed large account with [contingent commission insurance company] to demonstrate our willingness to continue our relationship.  Moved a number of accounts to [contingent commission agreement carriers] for the sole reason to demonstrate partnership.

Other employees were similarly praised in performance evaluations for increasing Marsh's contingent commission income from insurance companies "by achieving budgeted tiering goals."

66.    HRH has stated that it will "not renounc[e] overrides or contingent commissions" and that it will "stop accepting volume based contingent commissions but will continue to take profit-based contingent commissions from insurers."

67.    As discussed above, the Contingent Commissions are maximized by the Broker Defendants steering their clients, including Avery, to purchase only policies issued by the Insurer Defendants, in return for the Contingent Commissions.  Avery is informed and believes, and on that basis alleges, that the Broker Defendants place their clients' business predominantly with certain

insurers, including the Insurer Defendants, to maximize the Contingent Commissions they receive at the expense of their clients, including Avery, and in breach of their fiduciary duties. Contrary to Avery's expectations, the Broker Defendants' financial interests are in direct conflict with Avery's interests. The Broker Defendants' duties to Avery have been co-opted by Contingent Commission Agreements, and the steering and bid-rigging resulting therefrom.

68. Avery is informed and believes, and on that basis alleges, that the Insurer Defendants likewise fail to adequately disclose to Avery the existence of Contingent Commissions and the impact those commissions have on insurance arrangements. Instead, the Insurer Defendants actively take part in and cooperate with the Broker Defendants in their effort to conceal the Contingent Commission Agreements, and the revenue generated pursuant thereto, from their respective clients.

69. The industry itself has recognized that undisclosed Contingent Commissions corrupt the whole process. Clients are misled into thinking they are receiving impartial advice and the most economical and appropriate insurance products and services when, in fact, the broker is steering them towards products that will maximize the profits of the broker and insurer, to the detriment of the client. As the Risk and Insurance Management Society, Inc. ("RIMS") stated in a press release dated August 24, 2004:

> We believe that undisclosed contingency fees have the potential to compromise the very basis upon which the relationship is built. In an effort to preserve the integrity of this relationship, RIMS strongly advocates for complete and full disclosure of compensation agreements without client request.

70. Avery is informed and believes, and on that basis alleges, that the volume of Contingent Commissions together with the Wholesale Payments that are

received by the Broker Defendants have a material impact on their overall profitability.  The Contingent Commissions payable under the Agreements are part of the conspiracy between and among the Defendants, which has resulted in, among other things, steering and bid-rigging in order to allocate customers and maintain market share, all of which have the effect of restraining trade and competition in the insurance market and have led the Broker Defendants to:

     (a)    maximize the volume of insurance placed with the Insurer Defendants, who are parties to the Agreements;

     (b)    maximize the volume of renewal business placed with the Insurer Defendants;

     (c)    fail to seek, on behalf of their clients, including Avery, the most advantageous terms on the insurance coverage;

     (d)    fail to advise their clients, including Avery, to negotiate reductions of premiums payable through adjustments of terms, such as deductibles, in order to maximize the profitability of those policies for purposes of calculating the Contingent Commissions payable under the applicable Agreements; and

     (d)    discourage clients, including Avery, from filing certain claims or assisting the Insurer Defendants in denying or reducing claims under their policies in order to maximize the profitability of those policies for purposes of calculating the Contingent Commissions payable under the applicable Agreements.

     71.    Avery is informed and believes, and on that basis alleges, that, as a result of the Contingent Commissions, it has paid insurance premiums in excess of what it would have paid had the Broker Defendants acted in accordance with (i)

the terms of their contracts, (ii) their fiduciary and other duties, and (iii) their representations to Avery.

72.     Avery is informed and believes and on that basis alleges, that through the Defendants' fraudulent misrepresentations and failure to make adequate disclosure of the Contingent Commissions as set forth above, the Defendants have knowingly misled and continue to mislead and deceive their clients, including Avery.

## CLAIMS AGAINST DEFENDANTS

### Count 1: Per Se Illegal Violation of Sherman Act § 1 (All Defendants)

73.     Avery repeats and incorporates the allegations made in the preceding paragraphs as if fully set forth herein.

74.     Defendants have engaged in unlawful contracts, agreement combinations and conspiracies in violation of section 1 of the Sherman Act, 15 U.S.C. §1.

75.     The activities of the Broker Defendants and the excess casualty insurers, including the Insurer Defendants, that participated in the bid-rigging scheme as described in this Complaint were within the flow of, and substantially affected, interstate commerce.

76.     The Broker Defendants, in agreement with the excess casualty insurers, including the Insurer Defendants, orchestrated and supervised a scheme among competing excess casualty insurers to engage in bid-rigging.  The scheme included agreements the purpose and effect of which were to suppress or eliminate competition, and to fix the price that insureds, including Avery, paid for excess casualty coverage by rigging the bids submitted to Avery and other insureds.

77.     The Defendants implemented the unlawful scheme by the following acts, among others:

- Agreeing that the Broker Defendants would steer business to the Insurer Defendants in exchange for undisclosed fees, kickbacks and other payments from the Insurer Defendants;

- Agreeing, through the use of collusive, fictitious and inflated bid prices and other terms of sale, to manipulate bids for insurance contracts;

- Agreeing to engage in activities that give the appearance of competition where none existed;

- Agreeing to allocate insurance contracts among the Insurer Defendants, denying customers, such as Avery, the benefits of free and open competition; and

- Agreeing to the prices and the other terms to be submitted in collusive, fictitious and inflated bids for contracts of insurance.

78.    The Defendants' unlawful agreements, which constitute per se violations of section 1 of the Sherman Act, §15 U.S.C. §1, include unlawful bid-rigging, customer allocation and price fixing.

79.    The Defendants' agreements are per se violations of section 1 of the Sherman Act, 15 U.S.C. § 1, and were they not, they would nonetheless violate section 1 of the Sherman Act under the Rule of Reason.

80.    The agreements that the Defendants have entered into, maintained, renewed and enforced have had the purpose and effect of eliminating competition for excess casualty insurance.

81.    The bid-rigging agreements artificially inflated the Insurer Defendants' bids and thereby fixed and inflated the price that Avery paid for excess casualty insurance coverage.  The Defendants' unlawful conduct had the following effects, among others: (a) prices paid by Avery for insurance were raised, maintained or stabilized at artificially high, supra-competitive levels; and

(b) Avery was deprived of the benefits of free and open competition in the purchase of insurance.

82.     As a direct and proximate result of the Defendants' agreements in restraint of trade alleged in this Complaint, Avery suffered injury to its business and property in that it purchased insurance at higher prices and on terms less favorable than would have been available in a competitive market.

## Count 2: Unfair Practices (All Defendants)

83.     Avery repeats and incorporates the allegations made in the preceding paragraphs as if fully set forth herein.

84.     Avery acted as a consumer for purposes of its purchase of insurance broking services through the Broker Defendants.

85.     The Defendants have acted improperly by enjoying a scheme involving soliciting non-competitive bids from competing insurers; not disclosing or failing to disclose payment of Contingent Commissions; steering clients to "preferred" Insurer Defendants who participate in and further the scheme by paying exorbitant Contingent Commissions and other undisclosed commissions and kickbacks to the Broker Defendants; engaging in bid-rigging.  The Defendants employed deceptive acts and practices.

86.     The Defendants' conduct violated the California Business & Professions Code, §§ 16700 *et seq.*, §§ 16720 *et seq.*, §§ 17000 *et seq.* and 17200 *et seq.*

87.     Avery was injured as a result of the Defendants' violation by these acts.  The Defendants acted with the intent, purpose and effect of destroying competition and raising, maintaining or stabilizing prices for insurance products at artificially high levels.

88.     The Defendants' unlawful actions were intentional and done with the purpose and effect of injuring Avery and destroying competition.

### Count 3: Breach of Fiduciary Duty (Broker Defendants)

89.     Avery repeats and incorporates the allegations made in the preceding paragraphs as if fully set forth herein.

90.     The Broker Defendants and Avery had fiduciary relationships in which the Broker Defendants had a responsibility to provide services and advice for the benefit of Avery.  Because of this relationship, Avery placed confidence and trust in the Broker Defendants, authorized them to exercise discretionary functions for Avery's benefit, and relied on the Broker Defendants' superior expertise in risk management and the procurement of insurance.

91.     The Broker Defendants accepted and solicited that confidence and trust as described above in this Complaint.

92.     Based on the relationship between the parties and the representations described above, the Broker Defendants are common law fiduciaries to Avery, and therefore owe Avery:  (a) a duty of loyalty to act in Avery's best interests and to always put Avery's interests ahead of the Broker Defendants' own; (b) a duty of full and fair disclosure and complete candor in connection with any insurance-related products purchased by Avery or services rendered by the Broker Defendants, including the duty to disclose the source and amounts of all income the Broker Defendants receive in or as a result of any transaction involving Avery; (c) a duty of care in connection with any insurance-related products purchased by Avery or services rendered by the Broker Defendants; (d) a duty to provide impartial advice in connection with any insurance-related products purchased by Avery or services rendered by the Broker Defendants; (e) a duty to use the Broker Defendants' best business judgment in connection with any insurance-related

products or services purchased by Avery – *i.e.*, to find the best coverage at the lowest price; and (f) a duty of good faith and fair dealing.

93.     The Broker Defendants breached these duties by accepting Contingent Commissions and other kickbacks from the Insurer Defendants in exchange for steering business to the Insurer Defendants.  Thus, rather than providing objective, impartial advice which was in Avery's best interests, the Broker Defendants maximized their Contingent Commissions and other compensation at the expense of Avery.

94.     Accordingly, the Broker Defendants are liable for breach of fiduciary duty to Avery, and are liable for the damages suffered by Avery in an amount to be proved at trial.

### Count 4: Negligent Misrepresentation (Broker Defendants)

95.     Avery repeats and incorporates the allegations made in the preceding paragraphs as if fully set forth herein.

96.     The Broker Defendants and Avery had relationships of trust in which Marsh had a responsibility to communicate accurate information.

97.     The Broker Defendants intentionally or negligently misrepresented material facts to Avery and concealed material facts from Avery.  Avery reasonably relied on the Broker Defendants' misrepresentations and omissions and suffered harm as a result.

### Count 5: Negligence (Broker Defendants)

98.     Avery repeats and incorporates the allegations made in the preceding paragraphs as if fully set forth herein.

99.     As Avery's insurance brokers, the Broker Defendants failed to exercise reasonable diligence and perform with the skill or care ordinarily

possessed by companies acting in their capacity.  As a result of the Broker
Defendants' negligence, Avery suffered harm.

## Count 6: Tortious Interference with Prospective Business Relations (Broker Defendants)

100.   Avery repeats and incorporates the allegations made in the preceding
paragraphs as if fully set forth herein.

101.   Avery had a reasonable expectation of entering into a valid business
relationship with a competitive insurance carrier upon submission of a competitive
bid.  With knowledge and understanding of Avery's expectation, the Broker
Defendants wrongfully interfered with Avery's prospective business relations.  The
Broker Defendants interfered by engaging in wrongful acts that they knew would
harm Avery.  As a result of the Broker Defendants' interference, Avery suffered
harm.

## Count 7: Breach of Contract (Broker Defendant)

102.   Avery repeats and incorporates the allegations made in the preceding
paragraphs as if fully set forth herein.

103.   The Broker Defendant and Avery entered into contracts.

104.   Avery performed its conditions of the contracts.

105.   The Broker Defendant breached the contracts by failing to provide
proper advice to assist Avery in managing insurance costs; by failing to represent
the interests of Avery rather than the insurers; by failing to recommend, negotiate,
and implement cost-effective insurance; by failing to negotiate on Avery's behalf;
by failing to keep Avery informed of significant developments; and by failing to
use their best efforts to place insurance on behalf of Avery.

106.   As a result of the Broker Defendants' obvious and flagrant breaches,
Avery suffered harm.

## PRAYER FOR RELIEF

Plaintiff asks the Court to grant the following:

A.    Treble damages, and attorneys' fees and costs as remedies for the Defendants' violations of the Sherman Act and injunctive relief permanently enjoining the Defendants from violating section 1 of the Sherman Act through the conduct set forth herein;

B.    Forfeiture of compensation retained by the Broker Defendants; restitution of payments received from Avery; damages caused by the Defendants' conduct; punitive damages owing to the malicious, willful, and wanton nature of the Defendants' conduct; prejudgment interest; injunctive relief; and attorneys' fees as remedies for the Defendants' violations of state law; and

C.    All other relief that the Court deems just and proper.

# JURY TRIAL

Plaintiff demands a trial by jury on all claims and causes of action alleged herein.

Respectfully submitted,

 s/ James G. McCarney

James G. McCarney
Howrey LLP
Citigroup Center
153 East 53rd Street, 54th Floor
New York, New York 10022
(212) 896-6500

Joanne E. Caruso
Stephen Masterson
Amy Fink, Esq.
Howrey LLP
550 S. Hope Street, Suite 1100
Los Angeles, California 90071
(213) 892-1800

Attorneys for Plaintiff Avery Dennison
Corporation